IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs August 19, 2020

**ERIC JAMES BOGLE v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Marshall County**
**No. 2016-CR-7      M. Wyatt Burk, Judge**

_____

**No. M2019-01728-CCA-R3-PC**

_____

The Petitioner, Eric Bogle, appeals from the Marshall County Circuit Court's denial of post-conviction relief from his conviction for rape of a child. On appeal, the Petitioner argues that trial counsel provided ineffective assistance in (1) failing to introduce photographs of the Petitioner and the minor victim in order to establish a "positive relationship" between them and (2) failing to present evidence that the Petitioner's prescribed medication had an effect on his confession given to law enforcement. Following our review of the facts and relevant law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Joseph C. Johnson, Fayetteville, Tennessee, for the Petitioner, Eric James Bogle.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Robert J. Carter, District Attorney General; and Andrew Lee Wright, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner was indicted by a Marshall County grand jury for one count of rape of a child, and following a jury trial, he was convicted of the same. State v. Eric James Bogle, No. M2016-02284-CCA-R3-CD, 2018 WL 3108883, at *1 (Tenn. Crim. App. June 25, 2018), no perm. app. filed. The evidence presented at the Petitioner's trial showed that

the Petitioner performed fellatio on the minor victim, his stepson, while they were lying in the Petitioner's bed. Id. The victim later disclosed this abuse to his father and his stepmother while he was staying at their house, and his father contacted the authorities. Id. The victim testified that his mother married the Petitioner when he was seven years old, and, when he stayed overnight at the Petitioner's grandmother's house, the Petitioner showered with him and he slept in the Petitioner's bed. Id. The victim testified that, on one occasion when he was lying on the Petitioner's bed, the Petitioner "told the victim to take off his pajamas and get on top of him." The Petitioner then "'raised up,' put his mouth on the victim's penis, and sucked the victim's penis." Id. On cross-examination, when asked, "[H]ave you ever seen anybody else put their mouth on someone else's penis," the victim testified, "I seen my dad and my stepmom." Id. The victim also stated that a male classmate had put his mouth on the victim's penis. Id.

The victim's mother testified that the Petitioner "interacted with [her] children, and [her] children trusted [the Petitioner] and had a good relationship with him." Id. at *2. She stated that the victim sometimes slept with the Petitioner in his bed, but she did not have any concerns about this. Id. The victim's mother said that the victim had gone on a church trip with the Petitioner and stayed overnight with him at his grandmother's house. Id. When the victim's mother became aware of the allegations, she confronted the Petitioner, who said, "[t]hey will believe a child before they believe an adult." Id. The victim's mother testified that "between the time the victim returned from the church trip and she married the [Petitioner], she noticed 'a couple of changes' in the victim's behavior when he was around the [Petitioner]." Id. She stated that, at her wedding to the Petitioner, the victim "defecated on himself while the family was taking pictures," which was not normal for the victim. Id.

Detective Drew Binkley of the Marshall County Sheriff's Office testified that, on October 13, 2015, he and Detective Charles Bass spoke to the Petitioner at his grandmother's house and read the Petitioner his Miranda rights. Id. The Petitioner signed a waiver of rights form and gave the following statement:

[The victim] stayed at my house . . . for the first or second week of June for a week. During this week, we would take showers together. He would wash himself and get out and dry off while I washed myself. He never made any comments about my nor his genitalia during these showers.

One night, we were laying in our bed watching TV and [the victim] said something about his dad and stepmom and what he said he saw. He said he saw her giving oral sex to his dad. Then he talked about a boy putting his mouth on [the victim's] penis. He then stated, or started asking me to do that, but I kept telling him, No, that I was not going to do that. He took his

- 2 -

pajama pants off under the covers, then jumped up and put his penis in my mouth. I pushed him off and told him, No. He stated that felt good, Mr. Eric. That was what, that was what that boy did to me in school.

I didn't tell anyone, because I was afraid of what he would think.

Id. at *2-3. On cross-examination, Detective Binkley testified that he had contacted the Petitioner a month prior about coming to the police department to speak to detectives, but the Petitioner called the next day and said he had contacted an attorney. Id. at *3. Detective Binkley spoke to the attorney, who informed Detective Binkley that he had not been contacted by the Petitioner, and Detectives Binkley and Bass went to the Petitioner's home to ask him questions. Id. On redirect examination, Detective Binkley testified that, "prior to giving his statement, the [Petitioner] advised them that he recently had foot surgery and was taking hydrocodone[,]" but Detective Binkley said the Petitioner did not appear to be under the influence of drugs or alcohol. Id.

Several of the witnesses at the suppression hearing testified about the Petitioner's intoxication at the time of his interview with Detectives Bass and Binkley. The Petitioner's grandmother testified that the Petitioner had surgery on his ankle and was taking pain medication. Id. at *4. She said the Petitioner was wearing a boot when Detectives Bass and Binkley came to her house to interview the Petitioner on October 13 and that his ankle surgery had occurred about two months prior to his arrest. Id. Detective Bass testified that the Petitioner was wearing a foot brace when they arrived at his house to interview him, and the Petitioner advised the Detectives that he had recently had surgery and was taking hydrocodone for pain, which he had taken most recently the night before. Id. Detective Bass acknowledged that he wrote that the Petitioner was taking "hydrocortisone" instead of "hydrocodone" on his waiver of rights form. Id. Detective Bass explained the process that he and Detective Binkley took in interviewing the Petitioner. Id. On cross-examination, Detective Bass said it did not appear as if the Petitioner was under the influence of any substance at the time of the interview. Id. at *5. Defense counsel argued that the Petitioner's October 13 statement was involuntary due to "a very strong opiate he took the night before[,]" but the trial court "immediately ruled that the evidence did not show the [Petitioner] was under the influence of pain medication when he gave his statement[.]" Id.

Following deliberations, the jury convicted the Petitioner as charged, and the trial court sentenced him to thirty-five years' imprisonment to be served at one-hundred percent. Id. at *3. This Court affirmed the Petitioner's conviction on direct appeal, and he did not seek permission to appeal to the Tennessee Supreme Court. Id. at *1, 8.

On October 5, 2018, the Petitioner filed a pro se letter with the trial court clerk seeking relief from his conviction. On November 19, 2018, the Petitioner filed a timely amended pro se petition for post-conviction relief upon the order of the post-conviction court, alleging ineffective assistance of counsel. The Petitioner was appointed counsel, who filed an amended petition for post-conviction relief on May 20, 2019, alleging, inter alia, the same claims raised in the appeal. The post-conviction court held a hearing on the petition on August 23, 2019.

The Petitioner testified[1] that trial counsel was appointed to represent him after he was "dropped" by the Public Defender's Office, and he was not in custody at that time. He believed that he met with trial counsel three times at the Marshall County jail and that these meetings lasted about twenty-five minutes. He said that trial counsel discussed discovery and a trial strategy with him during these meetings. The Petitioner said that his family gave trial counsel photographs of himself, the victim, and the victim's mother, who was his wife, at their wedding. He said these photographs would show "how [the victim] loved [him] and that [the victim] was happy before. [The victim] was happy before [the Petitioner] got charged with [his] charge." He believed these photographs would have shown proof of his relationship with the victim and that trial counsel should have shown these to the jury. He believed that trial counsel failed to establish his relationship with the victim at trial.

The Petitioner said he did not believe that trial counsel effectively cross-examined Detective Bass at the hearing on his motion to suppress, and he wanted him to be called at his trial. The Petitioner stated that trial counsel knew that he was on prescribed pain medication at the time of his interview with Detectives Bass and Binkley, and he told trial counsel about the effects that this medication had on him at that time. He said that trial counsel "mentioned" his intoxication level at trial, and he did not ask trial counsel to put on expert proof of this, although he believed it would have helped his case.

On cross-examination, the Petitioner agreed that trial counsel filed a motion to suppress his statement to law enforcement, and he was aware that this motion was overruled by the trial court. He was not aware that this Court affirmed the trial court's determination on direct appeal. The Petitioner said that the victim defecated on himself at his wedding because he had been in trouble earlier that day. He agreed that testimony about the victim's defecating on himself came out at trial and that the victim's mother said this was not normal behavior, but the Petitioner insisted that this was normal and "[the victim] was having accidents before [they] met." The Petitioner said that trial counsel did not cross-examine any witnesses at his trial about his level of intoxication, although he agreed that trial counsel cross-examined Detective Bass about this issue at the suppression

---

[1] We will limit our recitation to the facts surrounding the issues raised on appeal.

- 4 -

hearing. He said that trial counsel called the Petitioner's grandmother at the suppression hearing, but she was unable to testify about his level of intoxication at that time.

On redirect examination, the Petitioner said that, because his grandmother could not testify as to his intoxication level, he wanted trial counsel to call an expert witness to testify about this at trial. He said he also wanted trial counsel to question the victim's mother about whether it was a normal occurrence for the victim to defecate on himself. On recross examination, the Petitioner agreed that trial counsel asked the following question: "So the accident, for all we know, could have been the fact that it was a long day at the wedding, right?"

Trial counsel testified that he was a self-employed attorney when he was appointed to represent the Petitioner, which was shortly after trial counsel moved to begin practicing law in Tennessee. He remembered reviewing the Petitioner's case file when he received the case from the Public Defender's Office, but he could not remember exactly what discovery he went over with the Petitioner. Trial counsel was appointed to represent the Petitioner when he was brought to court on a bond revocation, and the Public Defender's Office was allowed to withdraw from the case due to a conflict. Trial counsel said that it was his "pattern of policy and practice when [he was] meeting with clients before trial to go over strategy with them," but he could not say with certainty what exactly he went over with the Petitioner prior to his trial.

Trial counsel stated that he received photographs of the Petitioner and the victim, and he believed it was important to establish a relationship between them. He said he asked the victim's mother about the "circumstances surrounding [the] photographs" because he was going to "lay a foundation to having them admitted[;]" however, the victim's mother "surprised [him] by saying that after those photos were taken, even though they looked very happy, [the victim] had [an] . . . accident." Therefore, "based on that representation, [trial counsel] did not see any utility in going down that line of question[ing], and therefore, bringing the pictures in." Trial counsel believed that the Petitioner and the victim were smiling and standing close together and that this depicted a relationship between them. He said it "wouldn't have hurt" to establish this relationship, and he agreed that the photographs could have done this "subject . . . to the mitigating factors that [he] mentioned." Trial counsel deferred to the trial transcript to show if he attempted to establish this relationship in any other way at trial.

Trial counsel believed that he cross-examined Detective Bass about the Petitioner's intoxication at the suppression hearing. He did not call Detective Bass at trial because he believed that the State would call him as a witness, but he stated that, in retrospect, he was glad that he did not do so because the State could have asked him questions on cross-examination to reinforce the State's case. Trial counsel could not recall "for absolute

certain" whether he discussed the Petitioner's intoxication level with him, and he could not recall the specifics of any conversations they may have had on the subject. He said it "didn't cross [his] mind that it would be necessary" to call an expert witness to testify about the "effects of hydrocodone on someone's mental state[.]" He did not believe that this testimony would have been favorable because of the amount of evidence that corroborated the Petitioner's confession. He agreed that it would have been favorable to exclude the confession but that his trial strategy changed when the motion to suppress the confession was denied. He said he did not attempt to discredit the confession because he "would have to dismiss the veracity of the confession itself and prove through some extraneous evidence that perhaps the [victim] was lying and making this all up." Trial counsel could not remember any testimony coming out at trial that the victim had been abused by someone else.

On cross-examination, trial counsel testified that he became licensed in Tennessee in 2009 and had practiced primarily criminal defense work since then, and he also practiced criminal law before moving to Tennessee. The Petitioner's trial was trial counsel's first criminal jury trial in Tennessee. Trial counsel believed he met with the Petitioner more than three times, and he believed he went over discovery with the Petitioner. He received the photographs of the victim and the Petitioner from the Petitioner's family, and he said he gathered information about the Petitioner's relationship with the victim and the Petitioner's intoxication level prior to trial. Trial counsel said he went to Walgreens to get the Petitioner's prescriptions to "study" them, and he spoke to the Petitioner about his medication. Trial counsel also filed a motion to suppress the Petitioner's statement to Detectives Bass and Binkley due to the Petitioner's intoxication, and he believed that he cross-examined the witnesses at that hearing about this. He said he "poke[d] holes" in witnesses' testimony about whether or not the Petitioner was intoxicated at the suppression hearing and at trial.

Trial counsel recalled asking the victim's mother whether she would have married the Petitioner if she had "all of these doubts about [him], and the victim's mother responded that she did not notice any problems between the Petitioner and the victim prior to their marriage." Trial counsel said he received an unfavorable response from the victim's mother, so he decided not to introduce the photographs of the Petitioner and the victim because he did not want to "reiterate [the evidence] over and over again." Trial counsel believed that calling Detective Bass could lead to the State's highlighting the Petitioner's statement "over and over, again." Trial counsel believed the evidence showed that the Petitioner took hydrocodone the night before his interview with Detectives Bass and Binkley. Trial counsel believed that he had no reason to call an expert witness to testify about the Petitioner's level of intoxication, and he believed that this testimony could have brought even more attention to the Petitioner's confession. Trial counsel agreed that he cross-examined Detective Binkley about the Petitioner's intoxication level. Trial counsel

- 6 -

said he advanced the theory to the jury that the victim had seen sexual behavior from someone other than the Petitioner by cross-examining the victim on this issue. He also elicited from the victim that one of his classmates had performed sexual acts on him before. Trial counsel noted that this Court held on direct appeal that the evidence was sufficient to sustain the Petitioner's conviction, even without his confession. On August 27, 2019, the post-conviction court denied relief by written order. This timely appeal followed.

## ANALYSIS

On appeal, the Petitioner contends that trial counsel was ineffective in failing to present photographs of the Petitioner with the victim in order to establish a positive relationship between them and in failing to present evidence that the Petitioner's prescribed medication had an effect on his confession. The State responds that the post-conviction court correctly determined that the Petitioner received effective assistance from trial counsel.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance

prejudiced the defense.  Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936).  Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).  "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

"In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689).  Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89.  However, we note that this " 'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.' " House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**I.  Failure to Present Photographs of the Petitioner and the Victim.**  The Petitioner contends that trial counsel was ineffective by "failing to establish a positive relationship between the [Petitioner] and the alleged victim."  He avers that trial counsel could have done so by introducing photographs, which were given to trial counsel by the Petitioner's family, of the Petitioner and the victim together on the Petitioner's wedding day.  The Petitioner further contends that trial counsel should have questioned the victim's mother on whether it was normal for the victim to defecate on himself.  He asserts that this evidence combined would have established his innocence to the jury.  In response, the State contends that the post-conviction court correctly determined that "trial counsel made a reasonable strategic decision to cross-examine the victim's mother rather than introduce the photographs [of the victim and the Petitioner.]"  Further, the State asserts that the Petitioner cannot prove that trial counsel's decision was prejudicial because the evidence of the Petitioner's guilt was strong.  We agree with the State.

In its order denying the petition for post-conviction relief, the trial court held as follows:

The [Petitioner] contends that trial counsel should have introduced photos taken of the Petitioner and the alleged victim on the day of the wedding of the [Petitioner] and the victim's mother in order to establish a "relationship" between the Petitioner and the alleged victim. As mentioned in the factual summary, and as testified by trial counsel at the hearing, [trial counsel] did consider the introduction of said photos at trial during cross-examination of the victim's mother; however, at trial, after the victim's mother testified that the victim defecated on himself before all the photos could be completed, [trial counsel] decided to abandon this strategy. Although [trial counsel] did not introduce the photos as an exhibit, [trial counsel] DID cross-examine the mother about the taking of the photos, and attempted to describe the photos without their introduction []. As previously mentioned, once the victim's mother testified that the victim defecated on himself when standing next to the [Petitioner] while taking photos, trial counsel wisely abandoned this strategy. The fact that [trial counsel] selected one defensible strategy over another defensible strategy does not necessarily mean that the [Petitioner's] counsel was ineffective. The issue is whether the legal representation fell below an objective standard of reasonableness and whether the services were outside the range of competence demanded attorneys in criminal cases. In this case, the legal representation did not fall below an objective standard of reasonableness. [Trial counsel] was able to attempt to establish a positive image of the relationship between the victim and the [Petitioner] by establishing through cross-examination of the victim's mother that if she would have had any concerns with respect to the relationship between the victim and the [Petitioner], she would not have married the [Petitioner] []. These issues simply have no merit.

The evidence does not preponderate against the findings of the post-conviction court as it relates to this issue. Trial counsel testified that he received these photographs of the Petitioner and the victim from the Petitioner's family, and he was prepared to introduce these photographs at trial. However, when the victim's mother testified that the victim defecated on himself shortly after these photographs were taken, trial counsel abandoned this strategy so as not to emphasize this evidence to the jury. Trial counsel also testified at the post-conviction hearing that he cross-examined the victim's mother about her view of the Petitioner's relationship with the victim and that he asked the victim's mother if he was prone to having accidents. These choices were strategic decisions made by trial counsel based on the testimony presented at trial. See House, 44 S.W.3d at 515 (quoting Goad, 938 S.W.2d at 369). Further, the Petitioner failed to present these photographs or the victim's mother at the post-conviction hearing, and, as such, has not shown that these photographs would have established a positive relationship between the Petitioner and the victim or what the victim's mother would have said about their relationship. See Black v.

<u>State</u>, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Accordingly, the Petitioner is not entitled to relief on this issue.

**II. Failure to Present Evidence of the Effect of the Petitioner's Intoxication on his Confession.** The Petitioner also contends that trial counsel was ineffective by "failing to present any evidence regarding the [Petitioner's] prescribed medication and the effect that the medication had on the [Petitioner] during the [Petitioner's] interview with law enforcement." He asserts that trial counsel should have called Detective Bass to testify about the Petitioner's intoxication level during his interview of the Petitioner. The Petitioner also states that trial counsel should have called an expert witness to testify about the effects of the Petitioner's prescribed medication on his mental state. Lastly, he asserts that trial counsel should have called a lay witness to testify about his level of intoxication at the time of the interview. The Petitioner states, "If trial counsel had proven that [the Petitioner] was intoxicated at the time of his interview with Detective [] Bass, trial counsel would have been able to discredit [the Petitioner's] interview." In response, the State contends that the post-conviction court properly determined that trial counsel's decision not to call Detective Bass to testify at trial was a reasonable strategic decision. We agree with the State that trial counsel was not ineffective on this issue.

The post-conviction court found as follows on the issue in denying the petition for post-conviction relief:

> The [Petitioner] contends that trial counsel was ineffective when he did not call Detective Chad Bass as a witness at trial. At the hearing, [trial counsel] testified that he made a tactical decision not to call Bass during the trial. [Trial counsel] did call Bass at the suppression hearing and it was determined by [trial counsel] that his testimony would not be helpful to the [Petitioner] at trial, especially since his testimony was consistent with that of Detective Binkley. By calling him as a witness during the Defense proof, [trial counsel] testified that he was concerned that this would "open the door" for the State to continue to highlight the [Petitioner's] written statement previously admitted by the State. The Court has reviewed the transcript of the suppression hearing and has determined that [trial counsel's] tactical decision not to call Bass was reasonable. Calling Detective Bass on direct would have only allowed the state to further accentuate the inculpatory statement of the [Petitioner]. This issue is without merit.
>
> As testified at the hearing, [trial counsel] did, in fact, investigate the Petitioner's prescribed medication(s) and the effects that the medication(s) may have had on the Petitioner during his interview with law enforcement. [Trial counsel] testified that he went to the pharmacy and obtained a copy of

- 10 -

the prescription. Further, [trial counsel] interviewed the individuals (Bass, Binkley, and Porter) that were at the residence at the time of the interview with Bass and Binkley, and further determined that no witness could/would testify that the [Petitioner] was under the influence at the time the statement was made. Conversely, at the suppression hearing, the [Petitioner's] grandmother ("Porter") testified that she did not know the last time before the interview with Bass and Binkley that [Petitioner] had taken his pain medication. Further, two well-trained law enforcement officers testified that in their opinion, as trained law enforcement officers, the Petitioner was not under the influence at the time of the statement. [Trial counsel] attempted to draw doubt to the [Petitioner's] mental impairment at the trial []; however, the Jury simply did not sustain the argument.

Furthermore, at stated by the Tennessee Court of Criminal Appeals, the evidence is sufficient to support the [Petitioner's] conviction, with or without his statement to the detectives. Even if the legal representation fell below an objective standard of reasonableness and whether the services were outside the range of competence demanded attorneys in criminal cases by not retaining an expert to testify as to effect of the hydrocodone taken by the [Petitioner] not less than 16 hours before the interview with the detectives, the [Petitioner] has failed to show that it is reasonably probable that but for counsel's errors, the results would have been different. Conversely, this Court holds that the result would have been the same with or without the statement. This issue, together with sub-parts, is without merit.

Again, the evidence does not preponderate against the determination of the post-conviction court on these sub-issues related to trial counsel's strategic decision not to highlight the Petitioner's intoxication at the time of his interview with Detectives Bass and Binkley. Trial counsel testified that he cross-examined Detective Bass at the suppression hearing about the Petitioner's intoxication level, and he did not call Detective Bass at trial because he did not want to bring attention to the Petitioner's confession. Trial counsel did not believe that it would be necessary to call an expert witness to testify as to the effects of hydrocodone on an individual's mental state, and he cross-examined Detective Binkley on the Petitioner's intoxication level at that time. Trial counsel believed that, once the motion to suppress was denied by the trial court, he should change his trial strategy so as not to highlight the confession. He also stated that, even without the confession, the evidence presented against the Petitioner at trial was strong. These are all reasonable strategic decisions made by trial counsel. Again, the Petitioner failed to present any witnesses, either expert or lay, about the effects that the Petitioner's prescribed medication could have had on his mental state at that time. He also failed to present Detective Bass at the post-

conviction hearing.  See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As such, the Petitioner is also not entitled to relief on this issue.

## **CONCLUSION**

After a thorough review of the facts and relevant law, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, JUDGE